840 So.2d 335 (2003)
Ray J. KNIPE, Appellant,
v.
Laura KNIPE, Appellee.
Nos. 4D01-4148, 4D02-1347, 4D02-2296.
District Court of Appeal of Florida, Fourth District.
February 19, 2003.
Rehearing Denied April 16, 2003.
*336 Kenneth G. Spillias of Lewis, Longman & Walker, P.A., West Palm Beach, and Richard Barlow of Kibbey & Barlow, Stuart, for appellant.
Denise S. Calegan Desmond of Joel M. Weissman, P.A., Doreen M. Yaffa, P.A., and Denise Calegan Desmond, P.A., West Palm Beach, for appellee.
GROSS, J.
The primary issue we address in this appeal is whether the evidence supported post-dissolution modifications short of a change in primary physical custody where the parents failed miserably at sharing parental responsibility. We affirm the trial judge on this issue.
The trial court entered an amended final judgment of dissolution in October, 1998. The judgment characterized the proceeding as "bitterly and fiercely litigated by the parties." The judgment awarded the father primary residential custody of the couple's two children, finding that he was "more likely to facilitate and encourage a close relationship between the minor children and the Former Wife."
Five factors were significant to the court's custody decision in the amended final judgment. First, the mother asserted that the children had been sexually abused while in their father's custody, "[w]ithout any evidence of sexual abuse." Second, in a dissolution of marriage proceeding with a prior husband, the mother had made allegations that the child of that marriage had been sexually abused by the prior husband and members of his family. *337 Although the prior husband was arrested and jailed, the prosecutor refused to file formal charges. However, "[a]s a result of the financial and emotional strain put on him by the allegations of sexual abuse," the prior husband agreed to "surrender custody" of the child to the former wife and agreed not to see the child. At the time of the trial, the son from this prior marriage was seventeen, but he had no relationship or contact with his father. Third, the court found that the mother had had a "number of relationships with men." The breakup of these relationships ended her son's relationships with the men. As a result, the trial judge in this case concluded that the father could "provide a more stable and satisfactory environment for the minor children." Fourth, the mother had caused the father to be arrested and obtained a domestic violence injunction against him for which "there was an insufficient basis." Fifth, the court noted that the mother was unable to communicate with the former husband's family.
The final judgment declared that the mother would have shared parental responsibility. It also provided that she would have "reasonable and liberal visitation with the minor children, no less than as is set out in the attached visitation schedule for the Nineteenth Judicial Circuit." Both parents were "encouraged to promote and allow telephone contact between the minor children and the other parent."
This court affirmed the final judgment. See Knipe v. Knipe, 731 So.2d 161 (Fla. 4th DCA 1999). Soon thereafter, the mother filed a petition for modification. The modification litigation was as contentious and bitter as the original dissolution proceeding. Although the petition originally sought a modification of the children's primary residence, the mother abandoned that count at the beginning of the trial. She asserted that her true goal was to increase her visitation.
At the hearing, the mother testified that, despite the order of liberal and reasonable visitation, she was not accorded any additional overnights beyond the minimum set forth in the visitation schedule. Her telephone contact with the children had been severely limited. The father excluded her from decisions concerning the children's schooling. To curtail her time with the children, the husband threatened that if she did not stop volunteering at the children's school, he would remove them from that school. The father carried out the threat two weeks later and took them out of the school. The mother hired a private investigator to find out where the children were enrolled.
Dr. Stephen Alexander, a psychologist, testified as an expert witness for the mother. He described the situation between the parents as "extremely acrimonious" and "perpetually combative." He recommended overnight visitation from after school on Friday to the beginning of school on Monday morning. He opined that such visitation would allow the mother to participate in school and homework. Also, dropoffs at school would cut down on the contact between the parents, thereby lessening the opportunities for hostile exchanges witnessed by the children.
The existing visitation plan gave the mother overnights on Wednesdays during the weeks when she did not have weekend visitation. Dr. Alexander also opined that Thursday nights were more appropriate for overnight visitation; the non-custodial parent then had a four-day block, which allowed that parent to more fully participate in the child's life. Dr. Alexander said that the parents were probably unable to co-parent and to share parental responsibility as contemplated in the final judgment. He indicated that there was little *338 probability that the parents would be able to set aside their differences in the best interests of the children.
Dr. Mark Agresti, a psychiatrist, testified that the children were "starved for their mother" and that they would be adversely affected if they did not spend more time with her. He opined that where children do not spend adequate time with their mother, their development is compromised.
Pamela Black, a clinical social worker, whom the court had appointed to do a home study, said that the former wife functioned only as a "weekend parent." She stated that the children do not have the type of time with the mother that they need.
After the hearing, the trial judge made extensive findings:
9. The activities of the parties in this bitter divorce proceeding merely set the stage for what was to occur after the entry of the final judgment.
10. Under the terms of the temporary order, the Former Wife had been the primary residential parent, but once the final judgment was entered the Former Husband then became the primary residential parent, and the day following the entry of the final judgment ... the Former Husband took the police with him to gain custody of the children.
11. The following day, a Friday, the first weekend after the Final Judgment was entered, the Former Wife showed up at the Former Husband's home with the police to enforce the visitation arrangements.
12. What follows is a sampling of the parties' actions following the entry of the final judgment. It's not meant to be all-inclusive nor is it [designed] to show that one party is worse than the other.
a. The father enrolled the children in kindergarten. He listed his family members as emergency contacts, but did not list the Mother as an emergency contact.
b. The father sent copies of the divorce decree and the home study to the children's elementary school for the purpose of winning them over to his side.
c. The father's family, his parents and siblings, united on his behalf and campaigned against the mother.
d. On the day the appeal was affirmed by the District Court, a party was held at the father's home. The family put up a large sign on the side of the house that said, "Congratulations, you've won again." This celebration occurred at the very time the Former Wife was returning the children to the father's home.
e. At T-ball games the mother is ostracized by the father's family. Members of the family have called her names. When Mrs. Black, the home study evaluator, was present at one of the T-ball games the family took photos of Mrs. Black to try to determine who she was and sent cousins of the parties' children (young children 10 to 12 years old) to follow Mrs. Black to her car to write down the tag number in order to identify her.
f. When the children were in kindergarten and were dropped off by the father, the mother would come by school every day to kiss them good morning.
g. The mother and father rarely agree on any course of conduct concerning the children. They even used different names for their son with the father calling him Ray, initial J., and the mother calling him "Rayj," all one word.

*339 h. The mother continues to force herself into the private events that occur during the father's time with the children.... [A]n example of such an event would be birthday parties that the children attend that are not open to the public but that the mother appears at.
i. The parties cannot agree on medical treatment such as who the children's doctors are to be.
j. The parties continue to have disagreements on the meaning of the visitation plan and take every opportunity to find some confusion in the plan.
13. Although the trial court believed that the parties could share all decisions, time has shown this to be wrong ... and [considering] the evidence presented, constitutes a substantial change in circumstances.
14. The court appointed an attorney ad litem to represent the children. Mrs. Kirk found that the children were tired of the fighting; that the children adored their parents; that the children want to see the mother; and that the children want to see the mother more often. On behalf of the children she recommended that the mother's visitation be modified to give her more time.
15. The Court also appointed Mrs. Black to do a home study. This appointment was done at a time when the mother was seeking to be the primary residential parent. Mrs. Black found that the father should continue to be the residential parent, but in court recommended that the children have more time with the mother.
16. Although the final judgment says that the mother is to have liberal visitation, she's been limited to the minimum schedule in almost all regards by the father.
* * *
20. So that neither of the parents believes they have won or lost in this proceeding, this Court finds that both of the parents' actions are detrimental to the children. Each of the parents have "cloaked" themselves with the justification that they have done whatever they have done for the best interests of the children. The Court finds that sometimes the parents have taken actions that were in the children[']s best interest, but many more times, the effect of what these parents have done since the entry of the Final Judgment of Dissolution of Marriage, has not benefitted the children, but has harmed them....
The judge increased the mother's visitation. He changed her visitation from the Nineteenth Circuit's Standard Schedule ("no less than" two hours on Wednesday and every other weekend) to the Fifteenth Circuit's Model Schedule (Thursday night to Friday night and every other weekend).
Due to the animosity between the parents, the court gave the father the "ultimate decision-making authority" as to the children's extracurricular activities. The judge required the father to provide the mother all of the children's scheduled activities on a monthly basis. The court ruled that the mother would make all medical and dental decisions, provided that she continued to maintain medical and dental insurance for the children.
The former husband contends that the trial court erred in ordering these post-dissolution modifications because the evidence did not meet the threshold showing required by Haas v. Haas, 686 So.2d 799 (Fla. 4th DCA 1997), and McGlamry v. McGlamry, 608 So.2d 553 (Fla. 4th DCA 1992). Those cases provide that a "trial court may not modify visitation unless the party moving for such modification demonstrates: *340 (1) a substantial or material change in the circumstances of the parties since the entry of the custody and visitation order, and (2) that the welfare of the child will be promoted by a change in custody and visitation." Worthington v. MacGregor, 771 So.2d 576, 577 (Fla. 4th DCA 2000).
This "extraordinary" burden test requiring a "substantial and material" change in circumstances has been developed and applied in cases involving a change in primary physical custody. See Gibbs v. Gibbs, 686 So.2d 639, 641 (Fla. 2d DCA 1997); Zediker v. Zediker, 444 So.2d 1034, 1036-37 (Fla. 1st DCA 1984). The policies behind the test are to honor the res judicata effect of the original final judgment, see Zediker, 444 So.2d at 1036, and to "preclude parties to a dissolution from continually disrupting the lives of children by initiating repeated custody disputes." Pedersen v. Pedersen, 752 So.2d 89, 91 (Fla. 1st DCA 2000). Judge Altenbernd best described the policies behind the test in Gibbs:
The judiciary cannot referee every difficult parental decision made by divorced parents. Initially, a judge may be required to choose between the parents to establish the child's primary residence. After the court makes that decision, however, the parents must continue to fulfill their obligations to the child or children. Although it may be ideal to change the custodial parent for a particular child at some stage in his or her development, the best interests test is not intended to allow the court to micromanage a child's custody from the entry of the final judgment until the child becomes an adult. Even in cases of divorce, these decisions should usually be made by the parents in private. The court must trust that even divorced parents usually want what is best for their children and have far greater ability to assess the interests of the child than does a judge who intervenes in the decision-making process for only a few hours.
686 So.2d at 644-45.
The former wife demonstrated a substantial change in circumstances sufficient to justify the minor changes in the structure of the children's lives erected by the final judgment of dissolution. Where the mechanics of a final judgment become stuck because of the gross misbehavior of the parents, and the children are suffering as a result, a trial judge is not precluded from fine tuning the final judgment to improve the children's lives. One stated purpose of Chapter 61 is to "mitigate the potential harm to ... children caused by the process of legal dissolution of marriage." § 61.001(2)(c), Fla. Stat. (2001).
In compliance with the values of Chapter 61, the final judgment ordered "shared parental responsibility" and "reasonable and liberal visitation." This language is in accord with "the public policy of this state to assure that each minor child has frequent and continuing contact with both parents after ... the marriage of the parties is dissolved and to encourage parents to share the rights and responsibilities, and joys, of childrearing." § 61.13(2)(b)1., Fla. Stat. (2001). "`Shared parental responsibility' means a court-ordered relationship in which both parents retain full parental rights and responsibilities with respect to their child and in which both parents confer with each other so that major decisions affecting the welfare of the child will be determined jointly." § 61.046(15), Fla. Stat. (2001). Chapter 61 states the preference that divorced parties share parental responsibility; a court "shall order that the parental responsibility... be shared by both parents unless the court finds that shared parental responsibility *341 would be detrimental to the child." § 61.13(2)(b)2.
Chapter 61 contemplates that after a final judgment of dissolution, the parties can set aside their differences, share parental responsibility, and act in the best interest of their children. The law presumes that parents will abide by the terms of a final judgment and act reasonably with each other and their children. Here, the parents' post-dissolution conduct shredded the goal of shared parental responsibility. The evidence supports the conclusions that the father used the judgment as a club to punish and manipulate the mother and the mother disruptively and destructively inserted herself into the childrens' lives. A psychologist, a psychiatrist, the home study evaluator, and the children's attorney ad litem agreed that the children needed to spend more time with their mother.
The gross inability of the parents to comply with the goals of the final dissolution judgment obviously arose after it was entered. The parties were unable to share parental responsibility without acting in ways detrimental to their children. The modifications imposed by the trial court were an attempt to ameliorate the problems arising from the parties' postjudgment conduct. In line with Dr. Alexander's recommendation, the changes minimized the times the parents had to deal with each other and reorganized the mother's visitation to be less disruptive to the children.
We agree with Gibbs that a court cannot "micromanage a child's custody from the entry of the final judgment until the child becomes an adult." 686 So.2d at 645. However, given the concern of Florida for the welfare of children, a court should not be precluded in all cases from modifying a final judgment of dissolution after considering how the parties have responded to it.
We distinguish this case from Zediker. There, the first district held that the "inability of two otherwise intelligent and rational adults to communicate before, during or after visitation" did not amount to a substantial or material change of circumstances "which would justify a change of custody." 444 So.2d at 1036; see also Newsom v. Newsom, 759 So.2d 718, 719-20 (Fla. 2d DCA 2000) (reversing trial court's modification of custody, despite "acrimonious relationship" between parents, as mother had demonstrated consistent attempt at co-parenting. "The fact that the parents cannot communicate and get along does not constitute a material change in circumstances to warrant a modification of custody."). Both Zediker and Newsom involved a change in the children's primary physical residence. This case involved no such change in custody.
We also distinguish this case from Haas and Worthington. In Haas, the trial judge found no change in circumstances and made no finding as to whether a change in visitation would be in the best interest of the child. 686 So.2d at 800. Similarly, in Worthington, "the trial judge specifically found that the former wife had failed to show by competent substantial evidence that there had been any material change in circumstances and the final judgment [was] silent as to whether it would be in the best interest of the children to modify the visitation schedule." 771 So.2d at 577.
We have carefully considered the remaining issues, especially the award of attorney's fees to the mother under Rosen v. Rosen, 696 So.2d 697 (Fla.1997). We affirm all other issues except for one. The court entered an order awarding damages to the former wife arising from the former husband's failure to comply with an order *342 regarding the sale of the marital residence. The order failed to account for $10,000 that had been awarded to the former husband in the dissolution judgment. On remand the trial court shall enter an amended final judgment using a damages amount of $17,550.
SHAHOOD, J., and MAASS, ELIZABETH T., Associate Judge, concur.